UNITED STATES of America, Appellant,

v.

DUBUQUE PACKING COMPANY, a corporation, Appellee.

DUBUQUE PACKING COMPANY, a corporation, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 15348, 15349.

United States Court of Appeals Eighth Circuit.

April 27, 1956.

454

Benjamin Arac, Boston, Mass. (Matthew H. Czizek, Dubuque, Iowa, and Joseph Kruger, Boston, Mass., were with him on the brief), for Dubuque Packing Co.

Melva M. Graney, Atty., Dept. of Justice, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Francis E. Van Alstine, U. S. Atty., and Richard W. Beebe, Asst. U. S. Atty., Sioux City, Iowa, were with her on the brief), for the United States.

Before SANBORN, WOODROUGH and VAN OOSTERHOUT, Circuit Judges.

WOODROUGH, Circuit Judge.

The taxpayer, Dubuque Packing Company, brought this action to recover refunds of 1941 and 1942 taxes to the extent of overpayments resulting from retroactive adjustments to its net income for those years occasioned by taxpayer's subsequent election in 1946, approved by the Commissioner in 1947, to modify its method of inventory valuation. Refunds of the claimed overpayments were made by the Commissioner to the extent of the amounts of 1941 and 1942 taxes which, in the Commissioner's opinion, taxpayer had paid within the two-year period preceding the filing of claims for refund of the overpayments and, hence, as to which refunds were not barred by the statute of limitations provided in Section 322(b) of the Internal Revenue Code of 1939, 26 U.S.C.A.[1] Refunds of the remaining amounts of the overpayments were considered by the Commissioner to be barred by the statute of limitations provided in Section 322(b) in that, to the extent of those additional amounts, no taxes had been paid within the two-year period. The taxpayer contended (1) that Section 322(b) does not bar recovery of a *portion* of the unrefunded overpayments because its payment of certain proposed deficiencies in 1941 and 1942 taxes occurred on the date the deficiencies were assessed by the Commissioner rather than on the prior date when the amounts of the deficiencies, plus interest, were delivered by taxpayer to the Director of Internal Revenue, and (2) that refund of the remaining portion of the overpayments otherwise barred by Section 322(b) was saved from being barred by Section 3801 of the Code. The first issue, which involves the question of the time when payment of taxes is made with respect to Section 322(b) was decided by the District Court in taxpayer's favor. The second issue

1. Section 322(b) (1) provides that no refund shall be allowed or made unless the claim for refund is filed by the taxpayer (1) within three years from the time the return was filed by the taxpayer or (2) "within two years from the time the tax was paid, * * * whichever of such periods expires the later." In the present case the later period is the two-year period from the time the tax was paid, except as to one item and part of another on which *both* periods had expired.

was decided against taxpayer. The result was a judgment that taxpayer is entitled to recover a portion of the overpayments, with interest as provided by law. Each party has appealed from the part of the judgment adverse to it.

The facts in the case are reflected in stipulations of fact, exhibits and testimony and are not in dispute. They relate principally to the question raised by the Government's appeal—whether the taxes were paid within the meaning of Section 322(b) of the Code (1) when taxpayer delivered the amounts of proposed deficiencies, plus interest, to the Collector, as the Government contends, or (2) as the District Court held, at the later date when the deficiency taxes were assessed by the Commissioner.

Although the District Court made complete and accurate findings of fact in its opinion reported at 126 F.Supp. 796 and they are not complained of, both of the parties appellant emphasize that in deciding the question when the taxes were paid for the purpose of starting the statute of limitations on the claims for refunds here involved, it is not necessary "to state one conclusive test applicable to all cases for determining when a tax is paid * * *." In order that all of the facts we have considered may be fully shown, we restate them here mainly as presented for the government in its brief.[2]

Taxpayer is an Iowa corporation which has its principal office in Dubuque, Iowa, and is engaged primarily in the business of slaughtering, processing and packing meat products. It kept its books and filed its tax returns on the accrual basis and on the basis of a fiscal year beginning November 1 and ending October 31.

For the fiscal year ended October 31, 1941 (hereinafter called the taxable year 1941) taxpayer filed timely income and excess profits tax returns and paid the taxes shown to be due thereon ($44,301.-26 in income tax; $12,601.38 in excess profits tax) in quarterly installments in 1942. For the following fiscal year (hereinafter called the taxable year 1942) taxpayer filed a timely income tax return and paid the tax shown to be due thereon ($66,852.27) during the calendar year 1943.

On November 15, 1943, a revenue agent made an audit of taxpayer's 1941 and 1942 returns and on the basis of his findings proposed deficiencies for 1941 in income and excess profits taxes and for 1942 in excess profits tax.

The proposed deficiencies in income and excess profits taxes for 1941 resulted principally from increasing taxpayer's net income by reason of the disallowance of deductions, such as for losses claimed on property. Taxpayer indicated its agreement to all of the adjustments to its net income covering income tax for 1941 but did not agree to the excess profits tax deficiencies for 1941 and 1942 as it had filed an amended claim for relief from excess profits taxes under Section 722 of the 1939 Code. The 1941 income tax deficiency was in the amount of $2,927.11. On November 27, 1943, taxpayer transmitted that amount, plus accrued interest of $328.71, to the Director of Internal Revenue at Des Moines, Iowa. The $2,-927.11 deficiency was repeated in a 30-day letter to taxpayer dated April 26, 1945, which in addition to listing the deficiency gave $2,927.11 as the "Amount Paid on Deficiency" with no "Balance Due." The proposed deficiency in 1941 excess profits tax, to which the taxpayer had not agreed because of its claim for Section 722 relief, was later proposed in the amount of $6,936.79 and taxpayer remitted that amount, together with accrued interest of $1,841.67 to the Director on June 18, 1946. On that same date taxpayer executed a waiver of restrictions on assessment and collection of the 1941 income and excess profits tax deficiencies and the deficiencies were assessed by the Commissioner of Internal Revenue on August 23, 1946.

---

2. The restatement does not change but somewhat amplifies the District Court's findings.

For the taxable year 1942 taxpayer paid its reported income tax during the calendar year 1943, but paid no excess profits tax during 1943. On April 26, 1945, a 30-day letter was sent to taxpayer proposing an excess profits tax deficiency for 1942 in the amount of $51,056.12, less an over-assessment of income tax of $31,421.30. The report accompanying the 30-day letter showed that the deficiency resulted from adjustments in net income principally for unallowable deductions, such as for a bad debt and for capital items. Taxpayer accepted the adjustments and made the following remittances to the Director:

May 12, 1945 . . . . . . . . . . . . . . . $34,207.60
June 2, 1945 . . . . . . . . . . . . . . . .    476.80
June 26, 1946 . . . . . . . . . . . . . .  1,446.97
                                          $36,131.37

On June 18, 1946, taxpayer executed a waiver of restrictions on assessment and collection of the 1942 excess profits tax deficiency and on August 23, 1946, the deficiency of $51,056.12 in excess profits tax for 1942 was assessed by the Commissioner together with interest thereon of $8,219.82. The balance of taxpayer's excess profits tax indebtedness for 1942 was extinguished (1) by crediting the $19,634.82 overassessment in 1942 income tax against the unsatisfied portion of the excess profits tax assessment on September 10, 1946, and (2) by taxpayer's transfer to the Director of $819.04 on September 11, 1946, and (3) by a $2,690.71 current excess profits credit.

Thus the following table reflects the situation with respect to the payments by taxpayer of 1941 and 1942 taxes:

| Types of Taxes | Amounts and dates of remittances to Director | Date of assessment |
|---|---|---|
| **1941** | | |
| Income tax | $44,301.26—1942 | |
| | 2,927.11—11/27/43 | 8/23/46 |
| Excess profits tax | 12,601.38—1942 | |
| | 6,936.79— 6/18/46 | 8/23/46 |
| **1942** | | |
| Income tax | 66,852.27—1943 | |
| Excess profits tax | 51,056.12—$34,207.60—5/12/45— | 8/23/46 |
| | 476.80—6/ 2/45 | |
| | 1,446.97—6/26/46 | |
| | 19,634.82—9/10/46 | |
| | (by credit of overpayment in 1942 income tax) | |
| | 819.04—9/11/46 | |
| | 2,690.71—Current excess profits tax credit | |
| | $59,275.94 (includes $8,219.82 interest) | |

With respect to taxpayer's remittances to the Director to cover the proposed deficiencies in taxes, Mr. Kisting, now secretary of and formerly an accountant for taxpayer, testified that, although assessments of the taxes had not cleared through the records, "we paid the amounts to stop the running of interest" and that "we * * * had no reason to consider the payments any different than income tax liability." "It was my understanding that the amounts [remitted] would be held in a suspense account."

The remittances received in the Director's office from taxpayer to cover the proposed deficiencies in taxes were covered and deposited into the Treasury. Any funds received in the office of the Director "which represent payment of taxes, either assessed or unassessed, are treated as tax collections" as being "advance payment of taxes." Advance payments of taxes which have not yet been assessed are credited to an account officially entitled "Unclassified Collection Account" but commonly called the "Suspense Account" and the credit in that account is transferred to a tax liability account when the taxes become the subject of a formal assessment, which represents the Director's authority to enforce collection of taxes not yet paid.[3] Taxpayer's remittances were credited to the "Unclassified Collection Account" commonly called the "Suspense Account," prior to the assessment of the deficiency taxes which the remittances covered. The name "Suspense Account" is a misnomer so far as holding payments in suspense is concerned. For a payment "that has strings on it" there is an altogether different accounting procedure, under which the payment goes into a "Special Deposit Account."

In computing its taxes for 1941 taxpayer had adopted the elective inventory method (sometimes called the "last in, first out" or "lifo" method of inventory accounting), permitted by Section 22(d) of the Internal Revenue Code and filed a statement with its return indicating its election of that method. Treasury Decision 5407 (hereinafter called T.D. 5407), dated October 9, 1944, amended existing tax Regulations to provide that taxpayers who had adopted the elective inventory method "may elect to have such method apply to raw materials only (including those included in goods in process and in finished goods) * * *." Pursuant to T.D. 5407, taxpayer on June 20, 1946, gave the Commissioner written notice of its election to confine its use of the "lifo" method to raw materials. In September of 1947 the Commissioner approved this election with respect to inventories of pork and subsequently approved it with respect to hide inventories. Pursuant to taxpayer's election under T.D. 5407, the Commissioner redetermined the taxpayer's income and excess profits taxes for the prior years in which taxpayer had used the "lifo" method (commencing with the taxable year 1941) in order that taxpayer's taxes for those years would reflect taxpayer's election to confine the "lifo" method to raw materials. The redetermination of 1941 and 1942 taxes, made in December of 1947 and March of 1948, resulted in overpayments by taxpayer as follows:[4]

|      | Income Tax | Excess profits tax |
|------|------------|--------------------|
| 1941 | $3,861.78  | $ 4,861.45         |
| 1942 | 3,801.58   | 28,748.26          |

On May 28, 1948, taxpayer filed with the Director separate claims for refund

---

3. In answer to a question as to how an assessment of tax is accomplished, Revenue Agent Hoffman explained that— the assessment list is prepared in the Office of the Director, sent to Washington for signature by the Commissioner, and then returned to the Director. The Commissioner's signature is required, is the Commissioner's certification of the assessment list, and represents the Director's authority to collect any taxes on the assessment list if they had not yet been paid. Enforcement by collection is not proper until after the signature of the Commissioner * * *.

4. For the year 1943 (not involved here) the redetermination of taxpayer's taxes resulted in deficiencies in income and excess profits taxes which, in an order in Dubuque Packing Co. v. Commissioner, Docket No. 29958, dated July 28, 1953, the Tax Court found had in fact existed.

of the overpayments for 1941 and 1942.[5] The Commissioner notified taxpayer that the claims for refund of the overpayments were denied and taxpayer instituted this suit for recovery of the overpayments on June 23, 1952.

Subsequently, on or about May 21, 1954, the Commissioner issued refund checks to taxpayer in the amounts of $29,112.25 and $5,997.80. The $5,997.-80 refund check satisfied in full taxpayer's claim for recovery of the $4,861.45 overpayment in 1941 excess profits tax, alleged as taxpayer's second cause of action.[6] The $29,112.25 refund check represented a refund of the $28,748.26 overpayment in 1942 excess profits tax, for which taxpayer sought recovery in its fourth cause of action, to the extent of all but $6,847.43 of the overpayment, the remainder representing interest and a $5,440.98 refund as Section 722 relief. The $23,671.27 attributable to the inventory adjustment overpayment (including interest) was designed as a refund of so much of the inventory adjustment overpayment as was permitted by the statute of limitations provided in Section 322(b) but, through an error in computation with respect to interest, was excessive in the amount of $1,293.94, which the Government claims and the District Court held it is entitled to recover or to offset against any further amount held to be due taxpayer. The refund in respect of the inventory adjustment overpayment was made on the basis of the Commissioner's view that taxpayer's latest payment of 1942 excess profits tax were made, and therefore started the running of the statute of limitations under Section 322(b), when taxpayer made remittances to the Director to cover the proposed deficiency in its 1942 excess profits tax, plus interest.

Thus, of the $41,273.07 of overpayments of 1941 and 1942 taxes occasioned by the retroactive redetermination of those taxes by reason of taxpayer's 1946 election to confine its use of the "lifo" inventory method to raw materials, only $14,510.79, computed as follows, is now involved in this case:

| | |
|---|---:|
| 1941 income tax (Taxpayer's first cause of action) | $ 3,861.78 |
| 1942 income tax (Taxpayer's third cause of action) | 3,801.58 |
| 1942 excess profits tax (Taxpayer's fourth cause of action) | 6,847.43 |
| | $14,510.79 |
| Less excessive refund, because of error in computation of interest, on 1942 excess profits tax overpayment | 1,293.94 |

The above amounts were not refunded to taxpayer because the Commissioner believes that refund thereof is barred by the statute of limitations provided in Section 322(b) in that, as applied to those amounts, over and above the refunded amounts, taxpayer's claims for refund were not filed within two years of the payment of taxes. As will be seen from the following table, the two-year statute of limitations had run as to all of the overpayments in controversy if the payment of taxes occurred when taxpayer made remittances to the Director to cover

5. The claims for refund were for the amounts originally determined as overpayments by the Commissioner in 1947 and 1948, two of which were later revised by the Commissioner. The claims for refund of the overpayments of excess profits taxes were made by way of amendments to previous claims for refunds based on taxpayer's applications for Section 722 relief.

6. Since the claims for refund of the overpayments were made on May 28, 1948, and the taxpayer's latest payment of 1941 excess profits tax, in the amount of $6,936.79, was made not earlier than June 18, 1946, when taxpayer remitted that amount to the Collector, there clearly had been a payment of 1941 excess profits tax, in an amount in excess of the overpayment, within two years of the filing of the claim for refund of the overpayment in 1941 excess profits tax.

proposed deficiencies in taxes and, on the other hand, the statute of limitations had not run as to $2,927.11 of the 1941 income tax overpayment of $3,861.78 and as to all of the 1942 excess profits tax overpayment of $6,847.43 if the payment of taxes began to run on the date of assessment of the deficiencies:

Latest Payment of Taxes After Excluding Refunded Amounts

| Type of Taxes | Amount of Over-payment | Date of Claim for Refund of Over-payment | Amount | Date of trans-mittal to Director | Date of Assess-ment |
|---|---|---|---|---|---|
| 1941 income tax (1st cause of action) | $3,861.78 | 5/28/48 | $ 2,927.11 | 11/27/43 | 8/23/46 |
| 1942 income tax (3rd cause of action) | 3,801.58 | 5/28/48 | | 1943 | |
| 1942 excess profits tax (4th cause of action) | 6,847.43 | 5/28/48 | 34,207.60<br>476.80 | 5/12/45<br>6/ 2/45 | Assess-ment of $51,056.12 on 8/23/46 [7] |

### Opinion

■ Appeal of the United States. The appeal by the United States presents the single question whether the two year Statute of Limitations of Section 322(b) (1), 26 U.S.C.A., began to run against the taxpayer's claim for refund of overpayments of deficiencies: (1) when the taxpayer made the remittance in the amounts of the deficiencies to the Collector which it thought "would be held in the Suspense Account", or (2) when assessment was made by the Commissioner and the deposits held in the "Suspense Account" were applied by the Collector in satisfaction of the assessment.

The District Court observed that Section 322(b) provides that not only will the filing of a return start the statute of limitations running but also "payment" of the tax. It considered that a taxpayer may transfer money to tax collecting authorities for a number of reasons other than the satisfaction of a clearly defined tax liability and that not every transfer of money by a taxpayer to a Federal tax authority will constitute a "payment" under the laws relating to Internal Revenue. It reasoned that in the case of a proper tax return, the return itself defines the obligation, but where a taxpayer makes a transfer of money to the collector, the transfer itself does not define the tax obligation. Some further act is necessary. Accordingly, it concluded that a money transfer to a Federal tax authority (regardless of the original reason for the transfer) should start the statute of limitations running under Section 322(b) on the date that the tax obligation becomes defined. On this date the

7. The remaining payments on this deficiency of $51,056.12, plus interest of $8,219.82, are shown in a prior table. The amount thereof is the amount which the Commissioner refunded to taxpayer as an overpayment in 1942 excess profits tax by reason of the inventory revaluation, plus interest and the excessive amount of $1,293.94.

transfer becomes a "payment" because from this day forward the taxpayer has a fair opportunity to determine whether he has a claim for refund. The Court found its course of reasoning and its conclusion supported by the decision of the Supreme Court in Rosenman v. United States, 1945, 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535, and by Thomas v. Mercantile Nat. Bank, 5 Cir., 1953, 204 F.2d 943, and by Roles v. Earle, 9 Cir., 1952, 195 F.2d 346, certiorari denied 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637. Applied to the government's appeal, the reasoning compelled conclusion that the taxpayer's obligation became defined when the Commissioner made assessment on August 23, 1946, and the statute had not run when claims for refund were filed on May 28, 1948, (denied June 27, 1950 and July 13, 1950) or when the action was commenced on June 23, 1952. The Court declared "It is the view of the Court that the transfers of money made by the taxpayer in the instant case did not have the status of 'payment' until the tax deficiencies were formally assessed by the Commissioner." [126 F.Supp. 807.]

It is contended for the government against this view that the taxpayer's remittances constituted voluntary payment of the deficiencies. It stresses particularly that the taxpayer "agreed" to the deficiencies and that it waived the restrictions on assessment and collection of the deficiencies. But the "agreement" relied on was not an agreement to the obligation of an indebtedness in the ordinary sense. The revenue agent proposed deficiencies and the taxpayer by its "agreement" merely indicated its willingness that the taxing process go forward to assessment. The taxpayer's right to file claim for refund and bring suit was not lost by the agreement but was fully preserved to the taxpayer and the Commissioner on his part was not under obligation to assess the amount of the proposed deficiency by reason of the "agreement."

We agree that the conclusion reached by the District Court was required by Rosenman v. United States, supra. In that case, as in this one, the question was whether the statute of limitation began to run against the claim for refund of deficiencies when the taxpayer made the transfer of money to the Collector stating that it was "payment on account of the * * * tax" nearly three years later when the Commissioner made the assessment and the amount held in Suspense Account was applied against the amount of the assessment. The taxpayer's remittance was deposited as in this case in the Suspense Account so that the government had the use of the money and the government contended that "The payment was made at the time when the estate tax was immediately due and payable, though an extension for the filing of the return had been secured. Under these circumstances we [the government] submit that the 1934 payment should be regarded as the payment of tax". 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. at pages 537, 538. "The evidence shows an intention to pay the tax on the date the check was delivered to the Collector, even though the exact amount was not known". But the Supreme Court held that the taxpayer's remittance did not constitute a payment of tax so far as deficiency was concerned until that deficiency was assessed. Until the assessment there was no "tax" "erroneously or illegally assessed or collected as to which payment could be made. Until that time the liability was not defined."

We think the further declarations of the Supreme Court in the Rosenman case establish that the District Court was right in holding that the time when the deficiencies were paid in this case and the statute was started running against the claims for refund was when the assessments were made and the amounts held in the suspense account were applied. The Court said:

"In the books of the Collector the suspense account concerns moneys received in connection with federal estate taxes and other miscellaneous taxes if, as here, no assessment for taxes is outstanding at the time. On February 25, 1935 petitioners

filed their estate tax return according to which there was due from the estate $80,224.24. On March 28, 1935, the Collector advised petitioners that $80,224.24 of the $120,000 to their credit in the suspense account had been applied in satisfaction of the amount of the tax assessed under their return. On the basis of this notice, petitioners, on March 26, 1938, filed a claim for $39,775.76, the balance between the $120,000 paid by them under protest and the assessed tax of $80,224.24.

"Upon completion, after nearly three years, of the audit of the return, the Commissioner determined that the total net tax due was $128,-759.08. No appeal to the Board of Tax Appeals having been taken, a deficiency of $48,534.84 was assessed. The Collector thereupon applied the balance of $39,775.76 standing to the credit of petitioners in the suspense account in partial satisfaction of this deficiency, and on April 22, 1938, petitioners paid to the Collector the additional amount of $10,-497.34, which covered the remainder of the deficiency plus interest. The Commissioner then rejected the petitioners' claim for refund filed in March of that year. On May 20, 1940, petitioners filed with the Collector a claim, based on additional deductions, for refund of $24,717.12. The claim was rejected on the ground, so far as now relevant, that the tax claimed to have been illegally exacted had been paid more than three years prior to the filing of the claim, except as to the amount of $10,497.34 paid by petitioners in 1938. Petitioners brought this suit in the Court of Claims which held that recovery for the amount here in dispute was barred by statute, 53 F. Supp. 722, 101 Ct.Cl. 437. To resolve an asserted conflict of decisions in the lower courts we brought the case here. 323 U.S. 691, 65 S.Ct. 52 [89 L.Ed. 558].

"Claims for tax refunds must conform strictly to the requirements of Congress. A claim for refund of an estate tax 'alleged to have been erroneously or illegally assessed or collected must be presented to the Commissioner within three years next after the payment of such tax.' On the face of it, this requirement is couched in ordinary English, and, since no extraneous relevant aids to construction have been called to our attention, Congress has evidently meant what these words ordinarily convey. The claim is for refund of a tax 'alleged to have been erroneously or illegally assessed or collected', and the claim must have been filed 'after the payment of such tax', that is, within three years after payment of a tax which according to the claim was erroneously or illegally collected. The crux of the matter is the alleged illegal assessment or collection, and 'payment of such tax' plainly presupposes challenged action by the taxing officials.

"The action here complained of was the assessment of a deficiency by the Commissioner in April, 1938. Before that time there were no taxes 'erroneously or illegally assessed or collected' for the collection of which petitioners could have filed a claim for refund. The amount then demanded as a deficiency by the Commissioner was, so the petitioners claimed, erroneously assessed. It is this erroneous assessment that gave rise to a claim for refund. Not until then was there such a claim as could start the time running for presenting a claim. In any responsible sense payment was then made by the application of the balance credited to the petitioners in the suspense account and by the additional payment of $10,497.34 on April 22, 1938. Both these events occurred within three years of May 20, 1940, when the petitioners' present claim was

filed." 323 U.S. 660, 661, 662, 65 S.Ct. 537, 538.

It is conceded that the judgment for taxpayer here is supported by Thomas v. Mercantile National Bank at Dallas, 5 Cir., 1953, 204 F.2d 943. Compare Roles v. Earle, 9 Cir., 1952, 195 F.2d 346.

The Supreme Court stated in the Rosenman case, supra, that it did not need to consider the effect of the Current Tax Payment Act of 1943, Section 4(d). The government has laid stress on Section 4 (d) [8] here as tending to support its contention that the taxpayer's remittances here involved constituted "payments" that started the statute. But we agree with the reasoning and conclusion of the District Court that none of the provisions in anywise affect the conclusion of the Rosenman case that it is the act of assessment that starts the running of the statute. As stated in Thomas v. Mercantile National Bank at Dallas, supra, 204 F.2d at page 944, "Nor does subsection (c) of 26 U.S.C.A. § 3770, added to that section by the Act of June 9, 1943, have the effect of fixing a starting point for the statute of limitation different from that applied in the Rosenman case. That subsection provides that 'An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid.' This does not affect the period of limitation. That sub-section was enacted prior to the decision in the Rosenman case, so it could not have been enacted for the purpose of modifying that decision."

We find no error in the part of the judgment in favor of the taxpayer.

■ The Taxpayer's Appeal. Taxpayer contends that Section 3801 of 26 U.S. C.A. entitles it to recover all amounts in controversy notwithstanding the bar of the statute of limitations expressed in Section 322(b).

The District Court [126 F.Supp. 805] set forth all the relevant provisions of Section 3801 of 26 U.S.C.A. in its opinion and the Senate Finance Committee Report indicating the intent of Congress in respect to it and declared "In order for the taxpayer to sustain its claim for the refund of the overassessments in question under Section 3801, it must be established that there was a final determination; that such determination related to an item includable in its gross income; that such item was erroneously included in its gross income for another taxable year; that the correcting of the alleged error by normal procedure is prevented and that there was adopted in the determination a position maintained by the Commissioner which was inconsistent with the erroneous inclusion of the item of gross income of a prior taxable year."

The Court observed that,

"In the present case the redetermination of the value of the taxpayer's inventories for the past years 1941, 1942 and 1943, in which it had availed itself of the non-limited 'Lifo' method in light of its election of the limited 'Lifo' method, resulted in inventory valuation changes for all of those years. Such inventory valuation changes for the years 1941 and 1942 showed overassessments for those years. Such inventory valuation changes for 1943 showed a deficiency. It so happened that the year 1943 was an 'open' year for the collection of a deficiency, while the years 1941 and 1942 were 'closed' years as to refunds."

The Court found that the redetermination of the value of the taxpayer's inventories for the years 1941, 1942 and

---

8. 26 U.S.C.A. § 3770 as amended by Section 4(d) of the Current Tax Payment Act of 1943, c. 120, 57 Stat. 126. *Rule Where No Tax Liability:* An amount paid as tax shall not be considered not to constitute an overpayment solely by reason of the fact that there was no tax liability in respect of which such amount was paid.

1943, pursuant to the taxpayer's election, did not result either in an erroneous inclusion of an item of gross income or in the Commissioner's taking or maintaining an inconsistent position within the meaning of Section 3801. It appeared to the Court that, "For the Commissioner to forego assessing a reasonably certain deficiency for an 'open' year because of overassessments for closed years would seem to amount to an unauthorized assumption of the power on his part to remit tax liability."

On this appeal the taxpayer contends that the Court erred in finding that there were lacking in this case the two elements of an "erroneous inclusion of an item of gross income" and "an inconsistent position" on the part of the Commissioner. It is admitted that the Court's declaration that the Commissioner consistently computed the taxpayer's taxes first on the basis of the taxpayer's original returns and then on the basis of the taxpayer's election under T.D. 5407 without error is correct if the original computation and the recomputation are separately regarded. But it is argued that as the two computations were upon the same incomes and as they produce different results, the ones that are based on the original returns ought to be held to be "erroneous." The Commissioner's acceptance of the recomputation ought to be deemed inconsistent with his acceptance of the original. In that way the requirements of the statute are said to be met.

But the District Court [126 F.Supp. 804], correctly declared that Section 3801 deals with "items erroneously included in gross income" and with "correction of the effect of the error" by "adjustment" and " 'such adjustment shall be made only if there is adopted in the determination a position maintained by the Commissioner * * * which position is inconsistent * * *.' " Congress might have enacted that where there is recomputation on a changed basis of taxes for former years, the statute of limitations of Section 322(b) shall not be applied. But we do not find that the Court erred in holding that neither the election of the taxpayer to avail itself of the benefits of Treasury Decision 5407, nor the action of the Commissioner by virtue of such election saved the claim of the taxpayer here under consideration from the ban of Section 322(b) (1).

The judgment appealed from is in all respects affirmed.